UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS UNION-EMPLOYER PENSION FUND, et al., | ) ) ) ) | CASE NO.  5:14-cv-183 |
| PLAINTIFFS, | ) ) | JUDGE SARA LIOI |
| vs. | ) ) ) | MEMORANDUM OPINION |
| RUBBER ASSOCIATES, INC., | ) ) ) | |
| DEFENDANT | ) | |

Before the Court is plaintiffs' Motion to Dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), the counterclaim of defendant Rubber Associates, Inc. ("Rubber Associates," "company," or "defendant"). (Doc. No. 12 ["Motion"].) Defendant's counterclaim seeks equitable relief from an arbitrator's opinion finding Rubber Associates liable to plaintiff United Food and Commercial Workers Union-Employer Pension Fund ("Fund")[1] for withdrawal liability in the amount of $1,713,169.00.[2] (Doc. No. 5 ["Counterclaim"], ¶ 47 at 61.[3])

Rubber Associates opposed plaintiffs' motion (Doc. No. 18 ["Opp."]), and plaintiffs replied (Doc. No. 24 ["Reply"] and Doc. No. 25 ["Additional Authority"]). After the

---

[1] The Fund's trustees, Robert W. Grauvogl, Barbara Caruso, Carl Ivka, F. Steven Albrecht, John Halkias, and Ray Huber's (collectively "Trustees"), are also plaintiffs in this case.

[2] Plaintiffs' complaint seeks to enforce the arbitrator's opinion. (Doc. No. 1 ["Compl."].)

[3] All references to page numbers are to the page identification numbers generated by the Court's electronic filing system.

motion was fully briefed, the Court conducted a hearing, during which both sides argued their positions. For the reasons that follow, plaintiffs' motion is GRANTED.

## I. BACKGROUND

Rubber Associates is an Ohio corporation located in Barberton, Ohio, that manufactures molded rubber components. Defendant's employees were represented by the United Food and Commercial Workers Union, Local 880 ("Union"). Rubber Associates was a contributing employer to the Fund[4] for over 30 years pursuant to a series of collective bargaining agreements ("CBA") with the Union. The most recent CBA expired on January 31, 2007 (the "2004-2007 CBA"). (Counterclaim, ¶ 8 at 54.)

After unsuccessful negotiations to reach a successor agreement,[5] Rubber Associates implemented its final offer in May 2008. Shortly thereafter, the Union went on strike. On October 30, 2009, Rubber Associates received notice from the Union that the Union disclaimed interest in representing the company's employees.

The effect of the Union's disclaimer was a complete withdrawal by Rubber Associates from the Fund within the meaning of the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"). Using ERISA's statutory "presumptive method," the Fund calculated defendant's withdrawal liability obligation to be $1,713,169.00. (Counterclaim, ¶ 24 at 57.)

---

[4] The Fund is a multiemployer plan within the meaning of ERISA, § 3(37), 19 U.S.C. §§ 1002(37), and is maintained by contributing employers who have entered into collective bargaining agreements with various local unions. The benefit plan established by the Fund provides pension benefits to eligible plan participants. ERISA § 3(35), 29 U.S.C. § 1002(37). (Compl., ¶¶ 1, 2 and 4 at 1-2; Counterclaim, ¶ 3 at 54.)

[5] Rubber Associates alleges that the Union "made a number of unreasonable demands during negotiations[.]" (Counterclaim, ¶ 17 at 56.)

Rubber Associates requested that the Fund recalculate its withdrawal liability by a method proposed in the 1991 report issued by the Pension Benefit Guaranty Corporation ("PBGC") (Doc. No. 5-2 (PBGC's March 1991 *Union-Mandated Withdrawal Study Report* to Congress ["Report"])). The company reasoned that using a method in the Report was appropriate because defendant's withdrawal from the Fund was a "union-mandated" consequence of the Union's disclaimer. However, the Fund declined on the basis that ERISA's "presumptive method" was the correct method for calculating the company's withdrawal liability. (Counterclaim, ¶¶ 25, 27-28 at 58.)

Pursuant to the statute, Rubber Associates requested arbitration. (Counterclaim, ¶ 29 at 58.) After three days of hearings, Arbitrator John Sands ("Sands" or "Arbitrator" or "Arbitrator Sands") concluded that the Union's disclaimer was entirely voluntary and not caused by any action of Rubber Associates. (Counterclaim, ¶¶ 31-34 at 59.) Sands also concluded that, applying the statutory "presumptive method," the defendant's withdrawal liability of $1,713,16.00, due in quarterly installments of $18,471.00, was correctly calculated. (Doc. No. 5-1 (Arbitrator's Opinion ["Arb. Op."]) at 83.)

However, Sands declined to address the defendant's claim for equitable relief regarding the method of calculation because his arbitral powers are limited to determining whether the Fund correctly calculated the company's withdrawal liability in accordance with ERISA §§ 4201 and 4219. Whether defendant was entitled to equitable relief and the use of a different method to calculate its withdrawal liability, Sands concluded, was an issue exclusively within the jurisdiction of the district court under ERISA §§ 4221(b)(2) and 4301(1). (Arb. Op. at 83.)

3

That brings the Court to the instant action brought by plaintiffs to enforce the Arbitrator's award. Defendant's counterclaim for equitable relief, which is the subject of plaintiffs' motion to dismiss, claims that because its withdrawal from the Fund was union-mandated as defined by the Report, its withdrawal liability should be calculated by a method contained in the Report. (Counterclaim, ¶¶ 44-47 at 61.) Specifically, the defendant's counterclaim requests, among other things, the following relief:

> A recalculation and corresponding reassessment of Rubber Associates' withdrawal liability owed to the Fund pursuant to the direct attribution method described in the PBGC Report, which was determined in uncontroverted evidence offered in the arbitration to be in the amount of $312,000.

(Counterclaim at 62.)

## II.  DISCUSSION

**A.     Standard of Review**

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a claim—in this case, the sufficiency of defendant's counterclaim for equitable relief from plaintiffs' complaint to enforce the Arbitrator's Opinion. The sufficiency of a pleading is tested against the notice pleading requirements of Fed. R. Civ. P. 8. Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" The factual allegations in a pleading must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citing authorities). In order to survive plaintiffs' motion, defendant's counterclaim must "state a claim for relief that is plausible on its face" when the factual allegations in the counterclaim are accepted as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570). In other words, defendant's counterclaim must "contain

either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *DiGeronimo Aggregates, LLC, v. Zelma*, 763 F.3d 506, 509 (6th Cir. 2014), *cert. denied*, --S. Ct.--, 2015 WL 133025 (U.S.), (quoting *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 538 (6th Cir. 2012) (internal quotations marks and citation omitted)).

While the Court's consideration of documents for Rule 12(b)(6) motions is normally limited to the pleadings, there are certain exceptions. The Court may also consider exhibits attached to the pleading and referred to in the pleading. *Perko v. Ford Motor Co.,* No. 5:10CV514, 2011 WL 1769098, at *1 (N.D. Ohio May 9, 2011). In this case, the defendant both attaches and refers to the Arbitrator's Opinion and the Report in its counterclaim. Accordingly, the Court may consider both of these documents in ruling on plaintiffs' motion.

**B.     The Report**

Defendant's counterclaim for equitable relief revolves around the Report. A brief discussion of ERISA's statutory scheme for calculating withdrawal liability, and the background of the Report, will provide a useful context for the Court's analysis.

1.  Background of the MPPAA and withdrawal liability

"Congress enacted ERISA to ensure that 'if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it.'" *DiGeronimo Aggregates,* 763 F.3d at 509 (quoting *Nachman Corp. v. Pension Benefit Guar. Corp*., 446 U.S. 359, 375, 100 S. Ct. 1723, 64 L. Ed. 2d 354 (1980)). The PBGC was created by ERISA to administer a pension plan insurance program that provided benefits to plan participants even if their plans terminated with insufficient assets to support the guaranteed benefits. *Id*. (citing 19 U.S.C. § 1302; *Pension*

5

*Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720, 104 S. Ct. 2709, 81 L. Ed. 2d 601 (1984)).

When it became apparent that the PBGC would be overwhelmed by multiemployer plans in financial difficulty, Congress directed the PBGC to prepare a report analyzing the issue and making a recommendation. One of the PBGC's findings was that ERISA "failed to address the adverse consequences that occurred when an employer withdrew from a multiemployer pension plan[,]" leaving remaining employers with higher contribution rates, which triggered more withdrawals, creating a "vicious downward spiral." *Id*. at 509-510 (quoting *Pension Benefit Guar. Corp.,* 467 U.S. at 722 n.2). The PBGC recommended a rule requiring withdrawing employers "to pay whatever share of the plan's unfunded vested liabilities was attributable to that employer's participation." *Id.* at 510 (quoting *Pension Benefit Guar. Corp.* 467 U.S. at 723).

Based on the PBGC's recommendation, Congress enacted the MPPAA. *Id.* (citing 29 U.S.C. §§ 1381-1461). The policy of the MPPAA is to protect "the interests of participants and their beneficiaries of financially distressed multiemployer pension plans" and "to provide a financially self-sufficient program for the guarantee of employee benefits under multiemployer plans." 29 U.S.C. § 1001a(c)(3) and (4). To accomplish this objective, the MPPAA requires an employer withdrawing from a multiemployer fund to "make a payment of 'withdrawal liability,' which is calculated as the employer's proportionate share of the fund's 'unfunded vested benefits.'" *DiGeronimo Aggregates,* 763 F.3d at 510 (quoting 29 U.S.C. § 1381(b)(1)).

ERISA contains four statutory methods for calculating withdrawal liability. ERISA § 4211, 29 U.S.C. § 1391. "With minor exceptions . . . a plan determines the amount of unfunded vested benefits allocable to a withdrawing employer in accordance with the

6

presumptive method, unless the plan is amended to adopt an alternative allocative method. Generally, the PBGC must approve the adoption of an alternative allocation method." 29 C.F.R § 4211.1(a). The presumptive method, ERISA § 4211(b),[6] was used to calculate the defendant's withdrawal liability in this case.

    2. The Report—union-mandated withdrawal from multiemployer funds

In Section 412(a) of the MPPAA, Congress directed the PBGC to study "the necessity of adopting special rules in cases of union-mandated withdrawal from a multiemployer pension plan" and report those results to Congress. (Report at 86.) This study resulted in the Report at issue in defendant's counterclaim for equitable relief.

The Report recommended to Congress that a union-mandated withdrawal be considered to have occurred when: (1) a union voluntarily disclaims its status as the recognized bargaining agent for a group of employees; and (2) the plan refuses to accept the continued contributions that are proffered by the employer."[7] (Report at 112.) Because union-mandated withdrawals were very rare or had not occurred, the Report concluded that no special rules were needed. *Id.* But if Congress nevertheless decided that special rules were appropriate, the Report offered three methods for calculating withdrawal liability "without shifting a substantial burden for unpaid liabilities to contributing employers, participants remaining in the plan, or the insurance system." *Id.*

The parties do not dispute that Congress has not acted on the Report, amended ERISA, or adopted any special rules or methods for calculating employer withdrawal liability in the case of union-mandated withdrawals from a multiemployer fund.

---

[6] *See* 29 C.F.R § 4211.1(a).

[7] Sands found, and the parties agree, that both elements of a union-mandated withdrawal, as defined in the Report, occurred in this case. (Arb. Op. at 82.)

**C.      Federal Common Law under ERISA**

The defendant's counterclaim asks the Court to invoke its equitable powers under federal common law and utilize the Report's recommended method to calculate defendant's withdrawal liability. Specifically, Rubber Associates contends that its withdrawal liability should be calculated "pursuant to the direct attribution method of relief specified in [the Report]." (Counterclaim, ¶ 25 at 58.)

The circumstances under which a court may create federal common law under ERISA are very limited, and "restricted to instances in which (1) ERISA is silent or ambiguous; (2) there is an awkward gap in the statutory scheme; or (3) federal common law is essential to the promotion of fundamental ERISA policies." *DiGeronimo Aggregates,* 763 F.3d at 511 (citing *Local 6-0682 Int'l Union of Paper, Allied Indus., Chem. & Energy Workers v. Nat'l Indus. Grp. Pension Plan*, 342 F.3d 606, 609 (6th Cir. 2003)). Within these restrictions, the Sixth Circuit has concluded that the federal common law of ERISA pension plans provides for restitution claims, certain estoppel claims, and undue influence claims. *Id.* (citations omitted).

**D.      Analysis**

For the purpose of analyzing plaintiffs' motion, the Court will assume that Rubber Associates was subjected to a union-mandated withdrawal as defined in the Report, and that the factual allegations of the counterclaim are true. Even with those assumptions, the Court concludes that Rubber Associates fails to state a claim for relief. The Sixth Circuit has not heretofore recognized a claim under the federal common law of ERISA for equitable relief in the case of union-mandated withdrawals, and this Court finds no basis for doing so.

8

1. Defendant fails to state a claim for relief under federal common law

    a. *ERISA is not silent or ambiguous*

First, ERISA contains a comprehensive statutory and regulatory scheme for determining withdrawal liability and is not silent or ambiguous on the subject. ERISA §§ 42211(b), 4211(c)(2)-(c)(4). The defendant's withdrawal liability was calculated in accordance with the presumptive method—which is the method normally utilized unless the plan adopts another method approved. *See* 29 C.F.R. § 4211.1(a).

Further, ERISA contains a number of specific exceptions that reduce or eliminate withdrawal liability in certain circumstances, but an exception for union-mandated withdrawals is not among them. *See Cent. States, Se. and Sw. Areas Pension Fund v. Midwest Motors Express, Inc.*, 999 F. Supp. 1153, 1162 (N.D. Ill. 1998) (statutory citations omitted); *see e.g*. ERISA § 4204, 29 U.S.C. § 1384 (sale of assets to another employer); ERISA § 4235, 29 U.S.C. § 1415 (transfer to another plan due to change in bargaining representative); ERISA § 4218, 29 U.S.C. § 1398 (change in business form or suspension of contributions during labor dispute). Just because those exceptions do not include union-mandated withdrawals does not mean that ERISA is silent on the issue. *See DiGeronimo Aggregates, LLC v. Zelma, et al.,* No. 1:13-CV-1208, 2013 WL 5781172, at *2 (N.D. Ohio Oct. 25, 2013) (citing *Local 6-6082 Int'l Union of Paper*, 342 F.3d at 609-10). Congress was aware of the union-mandated withdrawal issue and requested that it be studied by the PBGC. If Congress intended to create special rules for union-mandated withdrawals, in addition to the other statutory exceptions it created, Congress knew how to do so. *DiGeronimo Aggregates,* 763 F.3d at 512 ("Had Congress intended to create a negligence cause of action in favor of contributing employers against trustees, it certainly knew how to do so.");

9

*Cent. States*, 999 F. Supp. at 1163 ("Had Congress wanted to limit the reach of the MPPAA to voluntary withdrawals, such a restriction could have easily been included in the statute.").

Finally, even in the absence of a specific exception in the statute for determining withdrawal liability, other methods for making that calculation can be considered. ERISA contains a procedure for obtaining PCBG approval to calculate withdrawal liability by a method other than the presumptive method. *See* 29 C.F.R. § 4211.1(a). No action was taken by the Fund or the PBGC to adopt another method for calculating the company's withdrawal liability in this case.

Congress has created a comprehensive legislative scheme that governs multiemployer plans, employer withdrawal liability, and exceptions thereto. For these reasons the Court concludes that ERISA is not silent or ambiguous on the subject of withdrawal liability. To the contrary, there is a strong presumption that Congress chose not to create a special provision for union-mandated withdrawals. *See DiGeronimo Aggregates,* 763 F.3d at 512 (citing *Nw. Airlines Inc. v. Transp. Workers Union,* 451 U.S. 77, 97, 101 S. Ct. 1571, 67 L. Ed. 2d 750 (1981)); *see also Cent. States*, 999 F. Supp. at 1162 ("Because Congress has mandated no such exception, the Court cannot carve out an exception for involuntary withdrawals or for withdrawals occasioned by the employees' decertification of their union." (citations omitted)).

b. *No awkward gap in ERISA's statutory scheme*

Second, the lack of a specific exception or method for calculating withdrawal liability in the case of a union-mandated withdrawal does not create an awkward gap in ERISA's statutory scheme. Congress intended that federal courts would create common law to fill gaps created by ERISA "only 'when necessary to effectuate the purposes of ERISA.'" *DiGeronimo*

10

*Aggregates,* 763 F.3d at 512 (quoting *Tassinare v. Am. Nat'l Ins. Co.*, 32 F.3d 220, 225 (6th Cir. 1994) (further quotation marks and citation omitted)).

The MPPAA's policy goals are to protect the participants and beneficiaries of multiemployer plans and the financial stability of those plans. 29 U.S.C. §§ 1001a(c)(3) and (4); *DiGeronimo Aggregates,* 763 F.3d at 512 ("The purpose of ERISA is to promote the interests of employees and their beneficiaries in employee benefit plans." (internal quotation marks and citations omitted)). The MPPAA imposed multiemployer fund withdrawal liability obligations on employers to accomplish this very purpose. Creating a federal common law exception for reducing withdrawal liability in the case of union-mandated withdrawals fills no gap that effectuates the purpose of ERISA. Rather, reducing defendant's withdrawal liability to the Fund would have the opposite effect. *See Bd. of Tr. of the W. Conference of Teamsters Pension Trust Fund v. Thompson Bldg. Materials*, 749 F.2d 1396, 1407 (9th Cir. 1984) ("If employers escaped liability merely because their withdrawals were involuntary, a major protective feature of the MPPAA would be undercut . . Congress [ ] reasonably might have assumed that union-forced withdrawals would be very rare and should be treated no differently from other business risks.").

Accordingly, the Court concludes that there is no "awkward gap" in ERISA that would be filled by providing Rubber Associates with the equitable relief of using a calculation method in the Report to reduce the company's withdrawal liability.

c. *ERISA policy not promoted by a union-mandated withdrawal liability exception*

Finally, providing the equitable relief requested in this case would not advance the purposes of ERISA and the MPPAA, which is to protect the interests of employees and beneficiaries in multiemployer plans, and to promote the financial stability of those plans. Creating an equitable exception in the case of union-mandated withdrawals would reduce

defendant's withdrawal liability and undermine ERISA's purpose. Rather than finding that the Report supports an exception to the statutory scheme for withdrawal liability, courts have instead used the Report to conclude, for example, that Congress did not intend to exempt from the MPPAA employers that involuntarily withdraw from multiemployer funds because their employees decertify the union. *Cent. States,* 999 F. Supp. at 1164 ("Consistent with the Report, Congress has not amended the MPPAA to exempt union mandated withdrawals from withdrawal liability. Thus, we conclude that Congress did not intent to exempt from the MPPAA employers . . . that withdraw from a pension plan because their employees decertify their union.").

The defendant's claim for equitable relief protects its own financial interests at the expense of the Fund participants and the financial stability of the Fund. ERISA's purpose is to protect plan participants, not contributing employers.

Accordingly, the Court concludes that providing Rubber Associates with the equitable relief requested would not advance the purposes of ERISA. *DiGeronimo Aggregates,* 763 F.3d at 512 (federal common law should only be created when it is necessary to effectuate the purposes of ERISA) (citing *Tassinare*, 32 F.3d at 225) (further citation omitted).

2. Defendant's opposition to plaintiffs' motion

Defendant advances three main arguments in opposition to plaintiffs' motion. First, that 29 U.S.C. § 1451(a)(1) permits an employer to challenge withdrawal liability on equitable grounds. Second, two federal cases have cited the Report with approval and provide a valid basis for awarding equitable relief. Finally, collusion between the Union and the Fund warrants equitable relief in this case.

12

*a. Statutory standing does not confer a substantive right*

As a threshold matter, defendant contends that it is entitled to maintain a cause of action for equitable relief pursuant to 29 U.S.C. § 1451(a). Section 1451(a)(1) provides that an employer who is adversely affected by an act or omission of any party with respect to a multiemployer plan may bring a cause of action for appropriate legal or equitable relief. *See DiGeronimo Aggregates,* 763 F.3d at 510. However, § 1451 "confers no substantive rights but simply identifies who can pursue a civil action to enforce the sections governing multiemployer plans." *Id*. (citing *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp*., 522 U.S. 192, 203, 118 S. Ct. 542, 139 L. Ed. 2d 553 (1997)). Defendant may have statutory standing to bring its claim, however, standing is a separate issue from whether defendant states a claim for relief.

The defendant's counterclaim does not contend that plaintiffs have violated any provision of ERISA in calculating defendant's withdrawal liability, that plan participants or the Fund have been harmed, or that the Arbitrator's fact findings or legal conclusions are incorrect. Rubber Associates also does not dispute the Arbitrator's conclusion that, applying the statutory presumptive method, defendant's withdrawal liability is accurately calculated. (Arb. Op. at 72.) Defendant's claim for equitable relief from the Arbitrator's Opinion lies, if at all, in the Court's lawmaking power under the federal common law of ERISA, which the Court has analyzed, *supra*.

*b. The Report is not a basis for relief*

Defendant also contends that the only reason the PBGC did not recommend that Congress implement special methods for calculating withdrawal liability in the case of union-mandated was because such situations were very rare or did not occur. But whatever the PBGC's

13

reason, the fact is that Congress has never acted to create such rules. Even so, defendant claims that two federal cases have cited the Report "with approval" and did not question the "validity or applicability" of the Report. (Opp. at 589-90.)

The first case is *Trs. of the Amalgamated Ins. Fund v. Crown Clothing, Inc*., 27 F. Supp. 2d 507 (D. NJ 1998). In *Crown Clothing,* the district court's reference to the Report was merely *dicta* in the context of defendant's argument that plaintiff had not asserted a colorable claim for payment of interim withdrawal liability, and not a validation of the Report as a basis for creating an exception to ERISA for calculating union-mandated withdrawal liability. *Crown Clothing*, 27 F. Supp. 2d at 514.

The second case cited by defendant case is *Findlay Truck Line, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund,* 726 F.3d 738 (6th Cir. 2013) (declining to create an exception to ERISA's arbitration requirement for "union-mandated" withdrawal). The Sixth Circuit's brief reference to the Report in *Findlay* was made in response to Findlay's argument for an exception to ERISA's arbitration requirement based on insufficient experience of the arbitrator because the Report stated that union-mandated withdrawals were rare. Undercutting this argument at the outset, the Sixth Circuit simply noted that Findlay's situation did not even meet the definition of a union-mandated withdrawal in the Report, let alone support Findlay's argument for an exception to ERISA's arbitration requirement. *Findlay*, 726 F.3d at 755. Arbitrator Sands also concluded that *Findlay* did not provide a basis for creating an exception to ERISA's comprehensive withdrawal liability scheme or his arbitral authority. (Arb. Op. at 78-81.)

This Court is not persuaded that passing references to the Report in *dicta* in *Crown Clothing* and *Findla*y support a conclusion that the Report, in the absence of

14

congressional action, creates a basis upon which this Court may provide the equitable relief sought by the defendant.

.          c. *Factual allegations do not support a claim for relief*

Finally, Rubber Associates contends that equitable relief is appropriate because its withdrawal liability was the result of "collusion" or "self-dealing" between the Union and the Fund. In its counterclaim, defendant alleges that: (1) Rubber Associates proposed during negotiations that it decrease its contribution rate to the Fund from 62 cents per hour to 30 cents per hour (Counterclaim, ¶ 12 at 55); (2) the Union presented the company's proposal to the Fund, but the proposal was rejected because the Fund was underfunded (Counterclaim, ¶14 at 55-56; Arb. Op. at 69); (3) prior to rejecting defendant's proposal, the Fund's actuary opined that collecting withdrawal liability from Rubber Associates would result in "better funding status" for the Fund than permitting Rubber Associates to decrease its pension contribution from 62 cents per hour to 30 cents per hour (Counterclaim, ¶ 15 at 56; Arb. Op. at 69); (4) in addition to rejecting the defendant's reduced contribution proposal, the Fund adopted an amendment providing that any employer contributing at a reduced rate would be deemed to have withdrawn from the Fund (*Id.*); (5) after the Union went on strike, defendant had no further contact with the Union until the defendant received a letter from the Union disclaiming interest in defendant's employees with no explanation (Counterclaim, ¶¶ 19-21 at 57; Arb. Op. at 71); (6) the Union's chief negotiator, Barb Caruso, who also serves as a Trustee, stated in an affidavit that the Union's disclaimer of interest was a unilateral act and that defendant had no involvement in the decision and did not request the Union's disclaimer of interest (Counterclaim, ¶ 22 at 57; Arb. Op. at 71); and (7) the Fund, "in collusion" with the Union, subjected defendant to a union-

15

mandated withdrawal and imposed withdrawal liability upon defendant for over 1.7 Million Dollars (Counterclaim, ¶¶ 23, 45 at 57, 61).[8]

Citing *Carl Colteryahn Dairy, Inc. v. W. Pa. Teamsters & Employers Pension Fund*, 847 F.2d 113 (3d Cir. 1988), Rubber Associates argues that the "self-dealing" of the Union and the Fund supports a basis for equitable relief from the statutory withdrawal liability calculation.[9] In *Colteryahn*, plaintiff alleged that through a series of misrepresentations, concealments, and non-disclosures regarding the financial status of the fund, the fund induced plaintiff to remain a contributing member. *Colteryahn*, 847 F.2d at 117. Colteryahn claimed that when it withdrew from the fund, those concealed fund liabilities increased its withdrawal liability. *Colteryahn*, 847 F.2d at 118.

Assuming the truth of Colteryahn's allegations, the Third Circuit held that "under the federal common law of pension plans, [ ] a defrauded employer may sue in federal court for the return of any withdrawal liability sums that were assessed as a result of a fraudulent inducement to join the [f]und." *Colteryahn*, 847 F.2d 122. The Third Circuit also found that ERISA "provides no basis for either adjusting or eliminating an assessment based on fraud or misrepresentation," and the court "doubt[ed] that Congress intended that innocent employers, penalized by the [the fund's fraud], would be without a remedy." *Colteryahn*, 847 F.2d at 119 and 121.

---

[8] While not alleged in the counterclaim, Rubber Associates contends that "collusion" between the Union and the Fund is also supported by the following facts: (1) at least half of the Fund Trustees are Union officials; and (2) the Union and Fund share the same office building and Union officials have regular access to the Fund's offices, including the Union's chief negotiator. (Opp. at 590 n.5.)

[9] Defendant also relies on *Mason and Dixon Tank Lines, Inc. v. Cent. States, Se. and Sw. Areas Pension Fund*, 852 F.2d 156 (6th Cir. 1988). However, this case does not aid defendant's argument. In *Mason and Dixon*, the district court, using its equitable powers under § 1451(a), reduced plaintiff's withdrawal liability to 25% of the plaintiff's net worth. *Mason and Dixon Tank Lines*, 852 F.2d at 163. However, the Sixth Circuit reversed and remanded, finding that the withdrawal liability issue involved statutory interpretation and must be submitted to arbitration. *Id*.

*Colteryahn* does not support defendant's position for a number of reasons. First, Rubber Associates concedes that its factual allegations do not state a claim for fraud. (Opp. at 604 ["While there may not have been 'fraud' in the classic sense, there was clearly self-dealing for the benefit of the Union and the Fund."].) Further, defendant cannot survive a motion to dismiss by simply asserting that the Union and the Fund engaged in unlawful collusion or self-dealing. Rubber Associates cites no law supporting a conclusion that the facts alleged, if true, constitute unlawful collusion or self-dealing.

Second, Colteryahn asked the court to reduce its withdrawal liability by the amount attributable to the fraud—not by utilizing a calculation method in a Report that Congress never enacted. Finally, while the Third Circuit in *Colteryahn* found that ERISA provided no mechanism to adjust withdrawal liability based on fraud, in this case the statute does provide a procedure to obtain the PBGC's approval to use a method different from the presumptive method for calculating withdrawal liability. *See* ERISA § 4211(c).

### III. CONCLUSION

Congress has established a well-developed legislative scheme that thoroughly addresses statutory methods for calculating withdrawal liability, procedures for obtaining PBGC approval to utilize calculation methods different from the presumptive method, and statutory exceptions to both in specific withdrawal situations. Congress was aware of the union-mandated withdrawal issue. While Congress chose to enact exceptions for certain specific withdrawal situations, it did not include union-mandated withdrawal among them, and ERISA's purpose will not be advanced by creating such an exception in this case.

Thus, the Court concludes that the defendant's counterclaim fails to state a claim for relief within the limited lawmaking authority of this Court under the federal common law of ERISA. Plaintiffs' motion to dismiss defendant's counterclaim is GRANTED.

**IT IS SO ORDERED**.

Dated: February 24, 2015

                                            **HONORABLE SARA LIOI**
                                            **UNITED STATES DISTRICT JUDGE**